**Office of Disciplinary Counsel v. Pierre**

Disciplinary Board Docket no. 193 D.B. 2003.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

RASPANTI, *Member,* June 13, 2005—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On December 9, 2003, Office of Disciplinary Counsel filed a petition for discipline against respondent, Alex Hugues Pierre. The petition charged respondent with violations of multiple Rules of Professional Conduct arising from allegations of misrepresentation to a client and opposing counsel, unlawful collection of a contingent fee, commingling of fiduciary funds and mishandling of several matters.

Disciplinary hearings were held on April 23 and June 3, 2004, before Hearing Committee 1.07, comprised of Chair Earl M. Forte, Esquire, and Members Lawrence A. Cabanel, Esquire and Patricia Furlong, Esquire. Respondent appeared pro se.

Following the submission of briefs by the parties, the Hearing Committee filed a report on December 17, 2004, finding that respondent violated the Rules of Professional Conduct, and recommending that he be suspended for a period of three years.

Respondent filed a brief on exceptions and request for oral argument on January 7, 2005. Petitioner filed a brief opposing respondent's exceptions on January 26, 2005.

Oral argument was held on March 7, 2005, before a three-member panel of the Disciplinary Board chaired by Marc S. Raspanti, Esquire, with Louis N. Teti, Esquire and Laurence H. Brown, Esquire.

This matter was adjudicated by the Disciplinary Board at the meeting of March 16, 2005.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, Office of Disciplinary Counsel, whose principal office is located at Suite 1400, 200 North Third Street, Harrisburg, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania, and to prosecute all disciplinary proceedings

brought in accordance with the various provisions of said Rules of Disciplinary Enforcement.

(2) Respondent, Alex Hugues Pierre, was admitted to practice law in the Commonwealth of Pennsylvania in 1993. His office is located at 1315 Walnut Street, 2nd Floor, Philadelphia PA 19107. He is subject to the jurisdiction of the Disciplinary Board of the Supreme Court of Pennsylvania.

(3) Respondent has no prior history of discipline.

*Charge I—The Saunders Matter*

(4) On July 9, 1998, Eula Mae Saunders was injured while a passenger on a SEPTA bus.

(5) On July 14, 1998, Ms. Saunders retained respondent by executing a 40 percent contingent fee agreement.

(6) By letter dated August 2, 1998, Ms. Saunders provided respondent with a bill for medical treatment she received for injuries sustained in the accident.

(7) By letter dated June 28, 1999, sent to respondent, Lisa A. Charleston, Esquire:

(a) informed respondent that she had been retained by NovaCare Outpatient Rehabilitation to represent NovaCare in obtaining payment of their medical bill for services rendered to Ms. Saunders in the amount of $4,106.25;

(b) advised respondent that NovaCare had instructed her to monitor the matter;

(c) requested that respondent supply certain information regarding any civil case he may have filed on behalf of Ms. Saunders; and

(d) inquired when respondent expected that NovaCare would receive payment.

(8) Respondent received this letter.

(9) By letters dated November 17, 1999 and January 21, 2000, Ms. Saunders provided respondent with bills for medical treatment.

(10) By letter dated March 24, 2000, Ms. Charleston supplied respondent with a statement of account, pursuant to respondent's request.

(11) By letter dated June 1, 2000, addressed to SEPTA's Claims Department, respondent advised that he represented Ms. Saunders, requested the opening of a claims file, and asked for the claim number so that Ms. Saunders' medical provider could be compensated.

(12) Respondent failed to file a civil action on Ms. Saunders' behalf for the third-party benefits on or before the expiration of the statute of limitations.

(13) By letter dated July 14, 2000, Ms. Cynthia E. Narvaez, claims supervisor with SEPTA, acknowledged receipt of respondent's June 1, 2000 letter and informed respondent that the statue of limitations had expired for third-party benefits.

(14) Respondent did not inform Ms. Saunders that he had failed to commence an action on her behalf for third-party benefits before the expiration of the statute of limitations.

(15) On October 19, 2000, Ms. Charleston spoke to respondent by telephone and told him that SEPTA had informed her office that Ms. Saunders' case was closed. Respondent asked Ms. Charleston to send him the docu-

ments she forwarded to SEPTA so that he could address this matter directly.

(16) SEPTA had erroneously closed its claim file, as Ms. Saunders' claim for first-party benefits had not expired. SEPTA remained liable to NovaCare and had a duty to pay NovaCare directly for medical treatment received by Ms. Saunders, up to the statutory limit.

(17) By letter dated October 27, 2000, Ms. Charleston:

(a) informed respondent that she had followed his advice of contacting SEPTA directly to obtain payment of NovaCare's outstanding balance, only to be told by SEPTA that the case was closed and not approved for medical payment;

(b) enclosed documents she had supplied to SEPTA and requested that respondent arrange for payment of NovaCare's outstanding invoice.

(18) By letter dated November 27, 2000, addressed to Ms. Narvaez, respondent requested that SEPTA pay Ms. Saunders' medical bill totaling $4,106.25, by tendering a check made payable to L.A. Charleston, and enclosed copies of documents from NovaCare that substantiated Ms. Saunders' medical bill.

(19) By letter dated December 5, 2000, Ms. Narvaez enclosed forms for respondent to complete so that SEPTA could process Ms. Saunders' claim for first-party benefits, and requested that respondent return the completed forms and affidavit executed by Ms. Saunders attesting to the absence of other applicable insurance.

(20) By letter dated December 5, 2000, Ms. Narvaez acknowledged receipt of respondent's FPB application

and affidavit and informed respondent that Denise Ferraro would be handling the claim for first-party benefits.

(21) By letter dated January 5, 2001, Ms. Narvaez informed respondent that she had yet to receive certain pertinent information from Ms. Saunders and reminded respondent that she could not properly evaluate the claim without such information.

(22) On February 7, 2001, respondent had Ms. Saunders sign and complete several forms to process her claim for first-party benefits.

(23) By letter dated February 14, 2001, respondent enclosed a physician's report to Ms. Saunders for completion.

(24) On July 9, 2001, respondent commenced a lawsuit against SEPTA to recover first-party benefits on behalf of Ms. Saunders.

(25) The complaint filed by respondent had attached to it a verification that was prepared and executed by respondent.

(26) By letter dated August 13, 2001, Harry J. Gerie, claims supervisor with SEPTA, extended an offer to settle Ms. Saunders' claim for first-party benefits for $5,000.

(27) Without divulging that SEPTA had made an offer of $5,000, respondent, on August 20, 2001, called Ms. Charleston to inquire if her client would compromise Ms. Saunders' bill of $4,106.25. NovaCare agreed to reduce its bill to $3,079.68.

(28) By letter dated August 20, 2001, Ms. Charleston confirmed that NovaCare agreed to respondent's request to compromise the bill by reducing it to $3,079.68.

(29) Respondent mailed to Ms. Saunders a release, which she signed and returned.

(30) The release did not state that Ms. Saunders was receiving $5,000 in settlement of her claim against SEPTA for first-party benefits.

(31) Respondent misled Ms. Saunders into believing that her settlement with SEPTA was for her claim for third-party benefits.

(32) Respondent mailed the General Release to Mr. Gerie and requested that he send respondent a $5,000 settlement check made payable to respondent and Ms. Saunders.

(33) Respondent filed with the prothonotary's office an order to settle, discontinue, and end the first-party benefits lawsuit.

(34) On November 20, 2001, Ms. Charleston spoke to respondent to inquire about the status of Ms. Saunders' case and was told by respondent that the settlement had yet to be completed and that he would advise her when distribution was ready to be made.

(35) On November 26, 2001, respondent received from SEPTA the $5,000 settlement check for first-party benefits made payable to respondent and Ms. Saunders.

(36) Respondent commingled his personal funds with fiduciary funds by depositing the settlement check into his checking account with First Union National Bank.

(37) NovaCare had an interest in not less than $3,079.68 of the $5,000 recovery because the funds were designated to satisfy any outstanding balances owed by Ms. Saunders to those medical providers who treated her for her injuries.

(38) Respondent failed to notify Ms. Charleston that he had received the $5,000 settlement check.

(39) Respondent had Ms. Saunders sign a document entitled "Approval of settlement and distribution."

(40) The settlement sheet stated that respondent was withholding $2,000 for attorney's fees and $300 for costs, and that the remaining amount of $2,700 was being distributed to Ms. Saunders.

(41) The settlement sheet was misleading in that it gave the false impression that the $5,000 was in settlement of Ms. Saunders' claim for third-party benefits and it left blank the section indicating the amount withheld for medical bills, creating the impression that medical bills were paid or would be paid from another source.

(42) Respondent retained $2,300 for his own use and benefit.

(43) Pursuant to 75 Pa.C.S. §1798(a), respondent was prohibited from charging and collecting a contingent fee for any services he provided in connection with Ms. Saunders' claim for first-party benefits for SEPTA.

(44) Respondent handed Ms. Saunders a personal check in the amount of $2,700, which had the word "settlement" written on the memo section of the check.

(45) Respondent misled Ms. Saunders into believing that the aforementioned check represented her share of the settlement proceeds of her claim for third-party benefits.

(46) Respondent misappropriated monies intended for NovaCare by dividing between him and Ms. Saunders the proceeds of the $5,000 settlement check.

(47) Sometime before receiving the settlement check, respondent asked Ms. Saunders to provide him with her medical card so that he could address any outstanding medical bills.

(48) Ms. Saunders gave respondent her medical card, which respondent did not return.

(49) Respondent intended to use Ms. Saunders' medical card to have the Commonwealth of Pennsylvania satisfy NovaCare's outstanding balance for treatment rendered to Ms. Saunders for her accident-related injuries, so that neither Ms. Saunders and/or NovaCare would discover that respondent had misappropriated funds intended for payment of NovaCare's bills, and so that Ms. Saunders would not discover that her third-party benefits claim had expired due to respondent's inaction.

(50) On January 17, 2002, Ms. Charleston called respondent to inquire about the status of Ms. Saunders' settlement.

(51) Respondent misrepresented to Ms. Charleston that he had not received any settlement monies from SEPTA.

(52) On February 11, 2002, Ms. Charleston called respondent to inquire about the status of Ms. Saunders' settlement.

(53) Respondent advised Ms. Charleston that Ms. Saunders' case had settled and misrepresented that he was not sure why NovaCare's outstanding balance had not been paid by SEPTA.

(54) On February 13, 2002, Ms. Charleston called respondent to inquire about payment of Ms. Saunders' outstanding balance.

(55) Respondent misrepresented to Ms. Charleston that he was not sure where the money went from Ms. Saunders' settlement and that he had to check with his partner, after which he would call Ms. Charleston.

(56) Respondent did not inform his law firm that he missed the statute of limitations in Ms. Saunders' matter.

(57) By letter dated April 25, 2002, which was received by respondent's law office on April 26, 2002, Office of Disciplinary Counsel advised respondent of Ms. Saunders' complaint.

(58) Under cover of a letter dated May 6, 2002, to Ms. Charleston, respondent forwarded to her a $2,300 check and represented that the check was for the "total remainder of the first-party funds collected," and requested a response as to whether the amount would be accepted.

(59) On May 10, 2002, Ms. Charleston hand wrote a notation on respondent's letter which stated that the file was closed. She initialed the notation and sent the letter to respondent by facsimile.

(60) On March 21, 2002 and March 22, 2002, respondent failed to maintain sufficient funds in the checking account equal to the minimum account of funds he was required to maintain on behalf of NovaCare.

*Charge II—The Campbell Matter*

(61) Respondent was retained by Derrick Campbell to represent him in two civil actions that were pending in the Philadelphia Court of Common Pleas; these actions were eventually consolidated.

(62) On February 2, 1999, during the trial, respondent failed to introduce certain insurance contracts into evidence before resting Mr. Campbell's case.

(63) On February 2, 1999, The Honorable Thomas D. Watkins granted defendants' motions for compulsory nonsuit and dismissed the case because of respondent's failure to introduce the insurance contracts into evidence.

## Aggravating Factors

(64) By letter dated November 1, 2002, respondent received notification of his transfer to inactive status by the Supreme Court of Pennsylvania, order dated November 1, 2002, effective December 1, 2002.

(65) From December 1, 2002 to at least June 3, 2004, respondent held himself out as a duly licensed attorney, by representing existing and new clients, including appearing as counsel in civil and criminal matters in Pennsylvania state courts, and by failing to take action to remove himself from the practice of law in accordance with the Pennsylvania Rules of Disciplinary Enforcement and Disciplinary Board Rules.

(66) Since the effective date of his transfer to inactive status, respondent has been listed as counsel of record in at least nine legal matters in the Civil and Criminal Divisions of the Philadelphia County Court of Common Pleas.

(67) As of the date of the second disciplinary hearing in June 2004, respondent still had not brought himself into compliance with the order of the Supreme Court.

(68) Respondent was transferred back to active status in July 2004.

(69) Respondent's hearing testimony was less than candid.

(70) Respondent did not show sincere remorse for his actions.

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent violated the following Rules of Professional Conduct:

(1) R.P.C. 1.1—A lawyer shall provide competent representation to a client.

(2) R.P.C. 1.3—A lawyer shall act with reasonable diligence and promptness in representing a client.

(3) R.P.C. 1.4(a)—A lawyer shall keep a client informed about the status of a matter and promptly comply with reasonable requests for information.

(4) R.P.C. 1.4(b)—A lawyer shall explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation.

(5) R.P.C. 1.5(a)—A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

(6) R.P.C. 1.15(a)—A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

(7) R.P.C. 1.15(b)—Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. A lawyer shall promptly deliver to the client or third per-

son any funds or other property that the client or third person is entitled to receive, and upon request by the client or third person, shall render a full accounting regarding such property.

(8) R.P.C. 4.1(a)—In the course of representing a client, a lawyer shall not knowingly make a false statement of material fact or law to a third person.

(9) R.P.C. 8.4(a)—A lawyer shall not violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another.

(10) R.P.C. 8.4(b)—A lawyer shall not commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.

(11) R.P.C. 8.4(c)—A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

## IV. DISCUSSION

Respondent has been charged with multiple counts of misconduct arising out of his representation of two clients, Eula Saunders and Derrick Campbell. Respondent's actions are set forth with specificity in the above findings of fact. Following a disciplinary hearing, the Hearing Committee found that petitioner met its burden of proof as to all violations of the Rules of Professional Conduct charged in the petition for discipline, and recommended to this board that he be suspended for three years. Respondent filed exceptions to the Hearing Committee report and requested oral argument before a three-member panel of this board.

Respondent raised four issues at oral argument. He represented himself at oral argument. Respondent contends that denial of his motion for appointment of counsel constituted a denial of his Sixth Amendment right to counsel. The board finds no legal merit to this issue. Respondent failed to establish that he had a right to appointed counsel paid for by the board. A disciplinary proceeding is not a criminal proceeding necessitating all of the constitutional safeguards that attach when a person's physical liberty is at stake. *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 345 A.2d 616 (1975).

Respondent contends that the Hearing Committee was not an independent arbiter and deprived him of his Sixth Amendment right to a trial before an impartial body. Respondent at no time before or during the proceedings in front of the Hearing Committee filed a motion for recusal of one or all of the panel members. The evidence offered by respondent to substantiate his claim consisted of findings made by the Hearing Committee which were perceived by respondent to be unfavorable to him, including the recommended disciplinary sanction of a three-year suspension. The factual findings made by the committee are supported by the evidence presented to the Hearing Committee. In writing its report, the committee provided detailed explanations of its factual and legal reasons for concluding that respondent's misconduct warranted a long suspension. Its conclusion that a three-year suspension was appropriate was based upon the committee's analysis of the facts and case law, and does not suggest any lack of impartiality.

Respondent argues that the Hearing Committee erred in making certain findings of fact which are not sup-

ported by the record and, furthermore, that the Hearing Committee improperly shifted the burden of proof to respondent to establish facts. The board concludes that respondent's argument has no merit. The committee properly stated that the burden of proof was carried by petitioner, and went on to cite to the record at the end of each factual finding.

Respondent submits that the Hearing Committee's recommendation of discipline is manifestly excessive and urges the board to impose a six-month period of suspension. Respondent cited numerous discipline cases to illustrate that three-year suspensions are reserved for demonstrable derelictions of duty involving large sums of money. *Office of Disciplinary Counsel v. Atlas,* 171 D.B. 2001, No. 919 Disciplinary Docket no. 3 (Pa. June 29, 2004) (three-year suspension for misappropriating $35,000 in firm funds, then refusing to make restitution); *Office of Disciplinary Counsel v. Olshock,* 28 D.B. 2002, No. 862 Disciplinary Docket no. 3 (Pa. Oct. 24, 2003) (three-year suspension where respondent misappropriated $18,000 in estate funds); *In re Anonymous No. 145 D.B. 1991,* No. 52 Disciplinary Docket no. 3 (Pa. Aug. 2, 1994) (three-year suspension for converting $20,775 from one client's trust and $54,800 from another client's trust).

Respondent cited several discipline cases wherein two-year suspensions were imposed by the Supreme Court. *Office of Disciplinary Counsel v. Levin,* 108 D.B. 2001, No. 883 Disciplinary Docket no. 3 (Pa. Feb. 18, 2004) (two-year suspension for mishandling entrusted funds, transferring funds from the escrow account to cover operating account overdrafts, and allowing escrow account

to be out of trust in varying amounts of money for more than two years); *In re Anonymous No. 46 D.B. 2000,* 687 Disciplinary Docket no. 3 (Pa. Aug. 15, 2001) (two-year suspension for converting $12,000 in funds of a non-profit organization and making cash withdrawals from the organization's funds totaling $2,000).

While it is at times difficult to appreciate the difference in factual circumstances between a two-year suspension and a three-year suspension, it is clear that the instant case does not involve the conversion of large sums of money as was present in the above cited cases resulting in three-year suspensions.

Respondent's argument is persuasive that a three-year suspension is excessive; however, the board does not accept his contention that a six-month suspension is warranted. Respondent's misconduct involved not only the complete mishandling of his clients' matters, but deception toward his client, Ms. Saunders, and opposing counsel.

Respondent made rudimentary missteps in his handling of Ms. Saunders' case, and very inartfully and dishonestly attempted to resolve the problems and cover his tracks. Aggravating factors present in this matter further suggest that a suspension longer than six months is necessary. Respondent has engaged in the unauthorized practice of law while on inactive status, he failed to show demonstrable remorse, and was found by the Hearing Committee to be less than candid in his testimony before the committee. Accordingly, the majority of the board is persuaded that a two-year suspension is justified by the facts and circumstances of this matter.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, Alex Hugues Pierre, be suspended from the practice of law for a period of two years.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Member Curran did not participate in the matter.

Board Members Sheerer, Newman, Rudnitsky and Saidis dissented for a three-year suspension.

Board Member Gephart dissented for a five-year suspension.

Board Members McLaughlin, Brown, Pietragallo and Nordenberg did not participate in the March 17, 2005 adjudication.

## ORDER

And now, August 30, 2005, upon consideration of the report and recommendations of the Disciplinary Board dated June 13, 2005, the petition for review and response thereto, it is hereby ordered that Alex Hugues Pierre be and he is suspended from the bar of this Commonwealth for a period of three years, and he shall comply with all the provisions of Rule 217, Pa.R.D.E.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.